The next case is 4-15-0582, Save Our Sandy, Appellant v. Department of Agriculture et al., Appelese. Appearing for the appellant, it would be Austin Moore, correct? And then for the, and I should note for the record, Mr. Moore, you are appearing here under the supervision of Attorney Elizabeth Huberts, is that correct? Correct. All right, thank you. And then for the Appelese, Attorney Manning, could you state your appearance? Yes, Donald Manning for PMC Management Corp. All right, thank you. And then Attorney Hanson, could you state your appearance? Christine Hanson for the Department of Agriculture. Thank you. It's my understanding that the Appelese are splitting their time equally, is that right? Ten minutes and ten minutes? Yes. All right, thank you, Counsel. All right, Mr. Moore, are you ready to proceed? Sure. You may. Good afternoon, Your Honors. Counsel, my name is Austin Moore. I'm a senior law student here under Illinois Supreme Court Rule 711 to represent the plaintiff appellates in this case, Save Our Sandy, or SOS. Members of SOS seek judicial review through a common law writ of certiorari of the Illinois Agriculture Department's administrative decision to allow VMC to construct a nearly 20,000 animal unit hog facility, I'm sorry,  SOS members live, work, and recreate in the immediate vicinity of VMC's proposed facility, some as close as a mere 2,000 feet away. VMC's noncompliance with the LMFA will cause SOS members to be subject to odors of the nearly 20,000 hogs, air and water pollution, increased traffic, diminution of their property values, loss in value of their business, and a loss of enjoyment of their properties and recreational activities in and along Sandy Creek. SOS members took advantage of all available avenues to oppose VMC's application when it learned that VMC's application did not comply with the LMFA. Some members of SOS received individual notice of VMC's intent to construct its facility, and the members received notice regarding a hearing at which the Ag Department was holding a determination upon VMC's permit. At that hearing, SOS members provided both oral and written testimony as to why VMC's application did not comply with the LMFA. SOS members then cross-examined VMC personnel at that hearing and were subject to cross-examination by those same personnel from VMC at that hearing. After the hearing, the Ag Department made its determination and granted VMC permission to continue with its construction. SOS members then sought judicial review of that determination from the Circuit Court, where the Circuit Court found that SOS members lacked standing to seek judicial review. The trial court erred, and SOS members can show that they have standing for two primary reasons. First, the review of this case is proper under a common law writ of certiorari, and the common law writ of certiorari is governed by the Illinois Supreme Court's rule laid out in Greer via the Illinois Housing Development Authority. That rule within Greer applies to this case, and SOS members can meet that rule. The second reason for why SOS members can show that they have standing is the non-binding determination of the Second District Court of Appeals in helping others maintain environmental standards v. BOSS or HOMES is unpersuasive because it applied the Administrative Review Law's party-of-record element to a statute that did not explicitly adopt it. Turning to this first point for why the common law writ of certiorari is the appropriate vehicle, I'd like to walk through some of the analysis that previous courts have held when determining if plaintiffs have judicial review or are standing to seek judicial review for an administrative decision. The Illinois Supreme Court has repeatedly held that there is a presumption that a judicial review of an administrative proceeding is allowed. Courts can look at that administrative proceeding and review it. The Illinois General Assembly is at its complete discretion to limit that presumption. When you look to determine whether or not that presumption is limited, you look to the underlying statutory language for that relevant action. So acts like the Administrative Review Law, the General Assembly has decided to adopt in certain statutes to rebut that presumption. If the underlying statutory language is silent as to whether that presumption is rebutted or not, then the presumption survives and the proper mechanism in which to determine whether a plaintiff can seek or has standing to seek judicial review is the rule laid out in Greer. Now all the parties here can see that the LMFA is the statute that governed both the Ag Department's actions and DMC's actions in this case. The LMFA does not have any sort of restrictive language that would preclude plaintiffs from seeking to have standing to seek judicial review or otherwise rebut the presumption that the administrative decision can be subject to judicial review. It's important to maybe think of these kind of two different avenues of a statutory language that can limit a plaintiff's ability to seek judicial review and a common law writ of certiorari as two separate vehicles. And in fact, Illinois case law has treated them as two separate avenues. The two vehicles are traveling along the same path in the same sense that they're both seeking judicial review, but they're two separate entities that have their different mechanisms and different aspects. So cases that have involved this party of record element from the administrative review law involve statutes that have either explicitly adopted the administrative review law or their statutory language that would otherwise rebut this presumption of reviewability. The cases that are brought under a common law writ of certiorari have followed the Greer rule, which looks at just injury and does not add this party of record element. I'd like to turn next to the Greer rule and what the Illinois Supreme Court stated that the rule was. So in Greer, a common law writ of certiorari was brought along with some other claims. A declaratory judgment was also brought. The court there found that regardless of what action was brought, it was a common law action that was brought. And a plaintiff could show that it had standing if it could show that an injury or threatened injury had three elements. Those three elements were distinct and palpable, fairly traceable to the defendant's actions. This is the injury is distinct and palpable and the injury is fairly traceable to the defendant's actions. And the injury would likely be prevented by the proposed remedy. SOS members can meet all three of these elements and thus show that they have standing to seek judicial review. Under the first element, distinct and palpable, what the Supreme Court did in Greer in its analysis of this element, it really quickly kind of walked through the plaintiffs in that case and found that the proximity and their close proximity to the proposed injury showed that their injury was distinct and palpable. So if I can step back, what was happening in Greer was a low-income housing facility was being proposed to be built near the plaintiffs in Greer. And the plaintiffs in Greer were described as neighbors and being close to that facility, and thus their closeness, their proximity to that facility allowed them to show that they had a diminution of property values. The court found that this proximity and closeness made their injury distinct and palpable. Similar here, members of SOS will be subject to the future harm of odors, air and water pollution, and other such things due to their proximity and closeness to BMC's proposed facility. To the second element, fairly traceable to defendant's actions, here the Ag Department improperly granted BMC permission to build its facility without complying with the LMFA, and thus it's fairly traceable to those actions. And finally, the injury is likely to be prevented by the proposed remedy, that remedy being that BMC's application must comply with the LMFA. By complying with the LMFA, it will do exactly what that statute was designed to do, that be, decrease the chance of severe harm occurring to those individuals that live within the vicinity of a facility such as BMC's. It's important to note that SOS members are not just or merely members of the general public. Again, their close proximity to BMC's facility is what allows them to show injury. Classifying them as just or only members of the general public discounts the relationship between the proximity and injury that the Greer Court found to be so persuasive when it found that the plaintiffs there had standing. Another aspect that I'd like to point out that further demonstrates the injury is the fact that some SOS members reside within the setback area. The Fitzgeralds, in particular, who live a mere 2,000 feet away from BMC's proposed facility, and in fact, BMC's own map demonstrates that they reside within that setback area. Now, the setback area goes to show two things. One, injury, and two, a participation in the underlying administrative proceedings. Because the Fitzgeralds resided within that setback area, they received individual notice about BMC's intent to construct, again, showing participation in the underlying administrative proceedings. Now, when you're talking about the setback area, are you talking about the populated area setback? Is that what you're referring to? Yes, Your Honor. So there's two different setback areas. There's one that's closer, and any one that occupies residence is a reference that that setback is referred to. And so where are you saying the Fitzgeralds live? They were in that second setback area. Populated area setback is what you're referring to? Yes, Your Honor. Yes, I believe that's the second one. And so when it says the populated setback area, given that they live within that area, are there others around them? I mean, do they meet the definition of populated setback area? No, Your Honor, they do not meet the definition of populated setback area. So kind of what happens and how setback is worked out is under the LMFA, you judge by the number of units that are at the facility, the annual units. So then you set that setback area. Based off that, you then dictate the smaller ring, which would be the occupied residencies, and then a larger ring of the populated areas. Now, if certain conditions are met, then certain rights are triggered for the individuals that live in there. So if you meet the definition of populated area, then you would have to get, the DMC would have to get permission from those individuals. So in this case, you don't have the 10 inhabited non-farm residences located within the area or where at least 50 people frequent a commonplace of assembly or non-farm business. Is that right? That's correct, Your Honor. And it's important to note SOS is not claiming that those rights were triggered here. Essentially, it would allow you to have those individuals have like a veto power. Essentially, you'd have to get permission from them before doing that. SOS is not claiming that. Right. I understand that. But it seems that you are arguing, well, they live within this setback area, so they're going to be impacted and that gives them standing. But technically, they don't meet the criteria. I believe there was one person who met one of the setback criteria areas and that person consented. Is that correct? That's correct, Your Honor. There was one individual, I believe, that lived in the occupied residency. Simply what the setback area does is provide further evidence to show injury. So let me explain. Under the LMFA, again, they set those regulations. The setback area is a recognition by the statute that those that live within that area are at a higher risk of having injury occur. Right. I understand completely. And I guess my point is you're just using that to say, well, they don't live within that area. But regarding the distance within which they do live, that they're going to be impacted by this, even though the statute doesn't give them veto power or anything like that. Correct, Your Honor. The statute does not give them. Those rights aren't triggered. But the fact that they reside within the setback area, as in the setback, they don't meet the populated, that definition. It is evidence that the LMFA is acknowledging that those within a close distance are at a likelihood of injury. And, again, them living in the setback or not living in the setback is not what causes standing to occur under its injury. So they can show standing because they were injured, and residing within that setback area is just one more piece of evidence to show why, in the statute's recognition of living that close to a facility, you have a higher increase of injury. So when you couple that with the fact that the facility does not comply with So moving on to the next point, the second reason why SOS members can show that they have standing is the non-binding determination of the Second District Court of Appeals in Holmes. Both VMC and the State claim that this Court should disregard the Illinois Supreme Court's binding precedent in Greer, and instead follow the non-binding precedent laid out in Holmes. Now it's important to know what the Holmes Court found. What the Holmes Court found was that only an applicant can seek judicial review regardless of the plaintiff's injury or level of participation in the underlying administrative proceedings. This holding is unpersuasive for two primary reasons. First, it applied the party of record rule from the administrative review law, which had not previously been applied to a common law rate of certiorari context. And, second, it failed to properly distinguish Greer. Turning to this first point, the misapplication of the party of record rule, the crux of the Holmes decision and the unpersuasiveness of it really boils down to this, again, application of the administrative review law as party of record element to the common law rate of certiorari. And it goes about doing this by relying upon one sentence from one case, that case being Dubin v. the Personnel Board of Chicago. Now it's important to note that in Dubin's standing was not an issue. The Court was looking merely at the scope of review. The facts are kind of convoluted, but essentially what the plaintiff was doing in Dubin, the plaintiff was not requesting judicial review of a final determination, but rather some sort of judicial comment or determination that the agency's finding of fact were insufficient and made the plaintiff's decision of whether or not to seek judicial review impossible to make. How the Court characterized what the plaintiff was asking was essentially to create sort of a third avenue at common law for a court to do some sort of, kind of insert itself into administrative proceeding and not just review that final determination. What the Court said was that if it allowed the plaintiff to do what it was asking, it would essentially allow plaintiffs to litigate every alleged error committed during an agency or administrative proceeding. The Court found that there was no case law to support this and the plaintiff could, of course, not do this. What the Court said was that it could seek, and if it did have an issue, it could seek the available remedies available to it, that being either a common law writ of certiorari to seek judicial review, if appropriate, or if the statute gave some guidance or dictated that procedure, then the plaintiff could use that statutory vehicle. That was all the Dubin Court was doing. It was not in any way saying that Greer was overruled or that the common law writ of certiorari and the administrative review law had combined completely. Those vehicles are still two separate avenues, merely that the scope of review and what the Court could look at mirrored each other within a common law writ and administrative review law context. It's important to note that Dubin was decided only one year after Greer by the same Court, the Illinois Supreme Court, and if that Court was intending to overrule and substantially get rid of what it held in Greer, it likely would have mentioned Greer somewhere in its opinion. But again, there is no mention of that in Dubin, suggesting that Dubin's argument was not the expansive interpretation that the defendants and Holmes found. The second reason for why Holmes is unpersuasive is because it failed to distinguish Greer. And there's kind of two points in which Holmes walked through and that the defendants argue in this case for why Greer is different than Holmes. The first point was that it didn't disagree with Williams or distinguish it in any way. And when I say Williams specifically, the quote is when the Court and Williams was essentially looking at the administrative review law. And that quote is, and I'll directly quote it here, the right to agree to administrative decisions is limited to those who are both parties of record to the agency proceeding and agreed by the agency's decision. Williams was brought and the underlying statute was through the administrative review law. So Williams is referencing this party of record element that is there in the administrative review law. Greer was brought under a common law writ of certiorari. Again, these are two separate vehicles. So why would Greer need to reference a case that had a statute that, again, rebutted that presumption and had statutory language guiding the Court on how and who can test and seek judicial review, whereas Greer was brought under the common law writ of certiorari. They're two separate cases and Williams didn't need, or I'm sorry, Greer did not need to distinguish itself from Williams on that basis. This very Court recognized this distinction in its holding in Sierra Club. In Sierra Club, the underlying statute had adopted the administrative review law. The plaintiff in that case tried to use Greer to argue that Greer was the applicable law. This Court in Sierra Club stated that Greer in no way on the underlying statute of Greer had explicitly adopted the administrative review law. It didn't adopt the administrative review law, so therefore Greer could not apply in the Sierra Club context because the administrative review law. The second reason for why Holmes and the defendants argue that Greer is distinguishable from Holmes really boils down to one point, and that is that Greer is somehow a quasi-legislative decision. Instead of looking at this presumption of reviewability, then looking to the statute to see if that presumption is rebutted, instead the defendants in the Court in Greer held that the proper analysis is to ask is it a quasi-judicial or quasi-legislative distinction as it relates to standing. It's important to note that nowhere in Greer's standing determination did it state that quasi-legislative or quasi-judicial was binding on its standing determination. The one phrase that the Holmes Court really boils in and looks at is the phrase non-adjudicatory administrative decision. They claim that this phrase, which is only mentioned twice in Illinois case law, once in Greer and the second time in Holmes when the Court quickly distinguished Greer, they claim that non-adjudicatory administrative decision means quasi-legislative. But Greer doesn't support that. In fact, non-adjudicatory was used as a synonym for several other phrases such as governmental action, state administrative action, and administrative of a decision. Never quasi-legislative. It was never suggested in that. Furthermore, the defendants argue that Greer somehow meets the definition of quasi-legislative when, in fact, it can be just as easily and is categorized as quasi-judicial. Turning to the final point that I would like to make, that SOS would like to make, is that even if the Administrative Review Law's party of record rule applies, and it's important to note that it's SOS position that that rule does not apply, that element does not apply, that SOS members can show that they are a party. The party of record rule, as adopted on the Administrative Review Law and interpreted by the case law that looks at those statutes that have adopted the Administrative Review Law, has never defined the phrase party of record. This absence of a definition might suggest that no one has the ability to seek standing to have judicial review. But if BMC wanted to seek judicial review, if its permit was denied, we likely would not be here today. So what do courts look at when they determine who is a party of record? And what courts do is they look at the underlying actions and roles that the plaintiff or party played in that administrative decision to determine on whether or not they have standing. This court did that in Sierra Club. In Sierra Club, the plaintiffs in that case, which again was governed by the Administrative Review Law, had only submitted letters. That was their only action in the administrative proceeding. In contrast, and the court stated several factors that the plaintiffs and actions that the plaintiffs did not take to show why they did not have standing, SOS members can meet and show that they did all of those actions that the court at Sierra Club found to be evidence as to why those plaintiffs did not have standing, and thus SOS members can show that they have standing. SOS members received individual notice. They could force a meeting, the hearing to be held under the statute, and they had a right to appear at that meeting, present oral written testimony, cross-examine, and be subject to cross-examination. For this reason, SOS members can show that they have standing to seek judicial review. In conclusion, Holmes is incorrect. It is unpersuasive, and it applied a rule of the Administrative Review Law to a statute that did not explicitly adopt it. Under a common law writ of certiorari, which this case can be brought under since the alma fae is silent as to who has standing, Greer governs and SOS members can meet that standing. Thank you. All right. Thank you, counsel. For the appellees, who will proceed first? Okay. Mr. Manning? May it please the court, I am Don Manning of the Rockford Law Firm. I represent VMC Management Corp. and Sandy Creek Lane LLC, the private defendants and the applicants in this case. I'll begin by just making a few comments about Greer because that was one of the main topics of counsel's comments. I will say this. I think a fair reading of Greer shows that the court clearly was not analyzing the issue of certiorari standing for purposes of the issues that were in that case. As I mentioned in a brief, my view is that, quite frankly, the certiorari subcount of the count in question that was being analyzed was lost in the wash. And I say that because when the court analyzed the issue of standing, it analyzed it from a declaratory judgment analysis. Not once did the Illinois Supreme Court mention issues about certiorari standing in its review. In addition, the court in Greer accepted the Illinois Housing Development Authority's assertion that its actions were non-adjudicatory. Now, we can bicker all day about the difference between quasi-judicial, quasi-legislative, non-adjudicatory, but what the distinction is, and I'll address this in a minute, is that when the Supreme Court accepted the IHDA's characterization of its act as non-adjudicatory, the Supreme Court then could not have been looking at certiorari issues because it doesn't work that way. They're separate things. Finally, I believe there was a comment made that the Greer standard has been used in post-Greer certiorari cases. I'm not aware of a single case where that's happened, and I don't think one has been cited. So with that, I'll turn to my prepared comments. First, I believe there's a question of public policy issue, and that is that animal farming and otherwise is a huge part of our state economy. It's a huge part of our state identity. And when the legislature put together the Livestock Management Facilities Act, the legislature was saying to operators, not just in Illinois, but regionally, nationally even, if you come to our state and you follow these rules, you can operate. What is terrible public policy, in my view, is to have anybody who works in the underlying process to have the right to hold a project up for two years. I know from personal experience that people aren't coming to this state because of problems like this. So the wrong message is being sent, even by dependency of these cases. This court has an opportunity to clarify the alarm. We hope that it will. Next, after having written about this, litigated it, and now thought about it in preparation for today, I think that there is a formula that can be easily applied in this kind of case to decide whether a plaintiff has standing or not. And it's this. The first thing the court would do is look at, is it a judicatory quasi-judicial action that's being done by the administrative agency? In other words, is this a decision affecting a small number of people and a specific set of facts like this? If it is, then the question becomes, well, is there an application of the administrative review law by incorporation into the underlying statute? If there is, fine. Follow the administrative review law. Everybody knows, and I think agrees, that under that statute, only parties of record agreed by the decision get to appeal the decision. That's it. And it's limited to the procedures in the administrative review act. But even so, if this underlying statute, enabling statute, does not incorporate the administrative review act, we know from over 100 years of Illinois Supreme Court precedent that the writ of certiorari is an available remedy. And we also know from 100-year-old precedent from the Illinois Supreme Court, we've cited these cases, that only parties who, only persons who are parties of record agreed by the decision have standing to pursue the remedy under the writ of certiorari. This is true. The statement I just made is true regardless of what anybody thinks about Dubin or the four or five other cases that in the last 20 or 30 years have said that the differences between ARA and cert have folded. It doesn't matter. What I'm saying is you can go back 100 years before any of that conversation and find the root of the standing issue for certiorari cases. Those are taxpayer standing cases, but they're certiorari cases. And it doesn't matter if, you know, we can argue about the bits and pieces of cases from 1904 through the present, but the bottom line is the one consistent thing that's happened in our state is the Supreme Court has said that to be a proper plaintiff in a certiorari case, you have to have been a party to the administrative proceeding who was agreed. And those cases are cited in our brief. So now, once that decision is made, so let's say that we get to the point of saying, okay, it's a cert question because the LMFA does not adopt the Administrative Review Act, so the question is, okay, it's certiorari. Then the court's job would be, well, let's look at the LMFA. Let's look at the statute itself and try and figure out to discern what the issue is. When it enacted, this is about who can appeal it. So when you turn to the LMFA itself, the only obligation the applicant has, literally the only obligation under the statute, is to give a notice of intent to the department. The only notice required under Section 12 is a notice then by the department to the county board. And then the county board has some things it can do, ask for a hearing and whatnot. But the point is, under the statute, nobody gets notice. This whole thing about the setback requirement, there is no notice, there is no requirement in Section 35 of that statute that says anybody gets any notice about it. It's not there. It's in the regulations, but it's not in the statute. If you carefully look at, compare the Section 35 to the regulations, you will see that that's an agency add-on. The statute itself does not require it. I don't think it makes a difference anyway. Now, if an informational meeting is convened, so if a county board or 75 residents petition the county board, if there is an informational meeting, here's the exact language, the only thing that the public gets to do, it says the department shall afford members of the public an opportunity to ask questions and present oral or written comments concerning the proposed construction. That's it. That's all it says. There's no entitlement to anyone to file an appearance. There's no entitlement to anyone to do anything other than ask questions, present oral or written comments concerning the proposed construction. That's it. So there's no other mention in the text of the statute about the rights of anyone other than the applicant. Zero. And as a result of that, I think that this whole question about whether the applicant is considered a member of the general public or not, they have to be. They have to be, because the statute says the department shall afford members of the public an opportunity to ask questions and present oral or written comments. That's it. It's the members of the general public getting to come in. So I think under a plain reading of this statute, the court would be compelled to say, wait, members of the general public do not have rights as parties. We have people testifying in things all over the place, in trials and cases. John Golden is a perfect example. Someone who was deeply interested in the result but was only a witness does not have standing as a party. To me, a party is a very specifically defined thing, and in this case, it would be the applicant and only the applicant. Now, there's been discussion about this whole thing about the setbacks. The fact is, and I don't blame anybody or cast any aspersions, but the fact is, the FFA regulations and the form, for convenience purposes, has the applicant inform people who are in a drag net area. So it's that populated area and the occupied residence area. But a populated area can't exist by definition unless you have the required number of people, the number of residents or people assembling. They didn't have that here. Nobody argues that they did. Therefore, there is no applicable setback that was violated. There's nobody that resides within a setback. The Fitzgeralds live outside of that setback. In terms of relationship to that and injury, in my view, what that means is that statutorily, they are members of the general public because they're not within the zone that gives them the veto right to stop the project, period. So by definition, under the terms of the statute, because they reside outside of the statutory setback area, they are a member of the general public. And members of the general public do not have standing. Thank you. Thank you, Mr. Manning. Ms. Hanson. Good afternoon, and may it please the court. Christina Hanson on behalf of the Illinois Department of Agriculture and its director. As our Constitution expressly provides, administrative action is reviewed only as provided by law. Oftentimes, review is through the administrative review law. But whereas here, the administrative review law has not been expressly adopted, nothing in the statute expressly forbids judicial review. It's reviewed under a common law writ of certiorari. But courts, as our Supreme Court has recognized in Dubin, Outcombe, and other cases, courts do not possess greater authority to review agency decisions under common law certiorari than they do under the administrative review law. Ms. Hanson, can I ask you a question? It seems to me if the Department of Agriculture denied VMC a permit, VMC would have appeal rights under administrative review or certiorari. Sure, because they were a party to the administrative proceeding. But if the Department of Agriculture made a mistake or wrongfully granted a permit, who would have standing to challenge that? If anybody. Does anybody have standing under the provisions of the Act? Under the LMFA, the party to the proceeding would be the VMC or the applicant. No, there would be no. I don't think there is another party that could bring that. What if there was someone that was within the setback? Somebody within the setback could veto the entire project, and they would have other avenues of relief, such as a co-warrant action, because the Department would be issuing an illegal action. So what you're saying is under this statute, the way it's been drafted by the legislature, as long as the permit's granted, nobody has the right to come in and challenge it administratively. Members of the general public do not have that right under the statute. The only thing they can do is appear at a public meeting and present testimony or evidence. So there's no check or balance is what I'm getting at on the Department of Agriculture to make sure that they've correctly followed all of the requirements that they're supposed to follow before they permit an operation like this. Well, additionally, the statute does not preclude common law remedies. And so if the statute is actually going to interfere with neighbors, adversely affect neighbors' interests, they can pursue common law remedies. But they would have to wait, the way I understand it. Tell me if I'm wrong. They would have to wait until the facility was built and they were impacted negatively before they could bring a nuisance lawsuit. Or file an anticipatory nuisance lawsuit, as was the case in the Bowes case. The Bowes case involved a writ of certiorari as well as common law nuisance claims. The statute itself, the Livestock Management Facilities Act, doesn't provide any avenue for neighbors of the facility to become parties to the administrative proceeding. The applicant files a notice of intent to construct with the department and notice of that is published. Pursuant to that, the county board may request a meeting. And if a meeting is held, members of the public, neighbors of the proposed facility, can come and can attend the meeting and present, ask questions, present testimony, either written or oral. But they don't become parties to the proceeding. I'm sorry, I'll back up. The county board can then issue a non-binding recommendation on the proposal, but the department makes the final decision. And notice of that final decision is sent to the applicant with a copy also to the county board. Do you know if the department has ever declined to permit one of these large facilities? I don't know the answer to that. It's not in our record. As another district of our appellate court held, nothing in the Livestock Management Facilities Act grants standing to members of the general public or neighbors of the proposed facility. And the Bose case was identical to this one on the facts. There was, the informational meeting was held, and the plaintiffs in that case presented, appeared at the informational meeting and offered their comments or questions. And the court held that they did not have standing to bring a judicial action. The Bose decision also distinguished Greer and that nothing in Greer, the court in Greer's standing analysis does not specifically address the writ of certiorari. Nothing in Greer overrules the general rule that in administrative review, only parties of record who are approved by the decision have standing to seek judicial review. In addition, this court in Sierra Club recognized that in, cited to Bose approvingly and recognized that in administrative review actions, only parties of record have standing to pursue judicial review. And as I noted, the plaintiffs here are not without remedy. If their rights are adversely affected as alleged, they have a remedy through traditional common law nuisance claims. Would you agree with this that based on the way the statute is structured currently, the legislature has not given the public the right to come in and challenge pursuant to the administrative review provisions under this act? Has not given the public the right, yes. So it would be a matter, in your opinion and the Attorney General's opinion, that the change needs to come from the legislature to allow the public to have a voice. Yes. The statute itself seeks to compete the interests of having a climate where these agricultural farms are welcomed and also ensuring that they do so in an environmentally responsible way. And the decision is put in the department's hands and there is no mechanism in the statute as currently written to allow neighbors of the facility or the general public to pursue administrative review of that decision. But like I said, they do have other remedies. If their interests truly are adversely affected, there are other remedies that they can pursue. Therefore, I ask that you affirm the decision below. Thank you, Counsel. Mr. Moore, do you have a rebuttal argument? Yes, Your Honor. All right, may I proceed? Thank you, Your Honors. I'd really just like to quickly address the two or three points that the appellees have made. I'd like to address the public policy argument that VMC made, the participation aspect, and then whether or not the statute has to grant a right in order for SOS members to show that they have standing. As the first point under a public policy argument, the purpose of the Alma Fe is explicitly stated. It's to balance the interests of two parties, those that run facilities such as VMC's and recognizing the economic benefit that they can provide to the State of Illinois along with those that live within the vicinity of a facility like VMC's, protecting the environment and those interests there. Under the defendants or the appellees and what Holmes found, under their understanding of the statute, only the applicant could seek judicial review. This could create a situation in which as long as the Ag Department signed off on something, regardless of whether it complied with the Alma Fe or not, those that lived within the vicinity of the area would have no remedies until something extreme happened, until the injury got to the point where other avenues of available remedies would be available to them. I'm unaware of any law that states that simply because you have other available remedies, that precludes a remedy that you might have available to you right then. So essentially under the appellee's definition and understanding of the Alma Fe, what could happen is that VMC could build its house 20 feet away from someone's home, clearly within the occupied residency of that setback area. And if the Ag Department signed off on that and agreed to it in clear violation of the Alma Fe, that individual would have no access to seek judicial review of that determination. I thought that individual had the veto right. They do, if you comply with the Alma Fe. If the Ag Department does not comply with the Alma Fe, then that individual would have no remedy. And that's not the situation we have here, correct? It is not the situation we have here, Your Honor, but under the Holmes Court's interpretation of the Alma Fe and the defendant's interpretation of the Alma Fe, the applicant, no matter the degree of injury, could not seek judicial review. I'm sorry, the individual who lived within the vicinity, no matter the injury or no matter how wrong the Ag Department was, could not seek judicial review of that determination. We are bound by the facts of this case, though, correct, in the record? Yes, we are, Your Honor. And I'd like to point out that the Alma Fe does not have to grant the right to have standing to seek judicial review. Instead, as the Illinois Supreme Court has repeatedly stated, there is a presumption built into a common law writ of certiorari, they say this in Outcome, they say this in Greer, that there is a presumption that that statute can be, the administrative proceeding, a plaintiff can seek it under judicial review. Now, the BMC mentioned that there are several cases, older cases, I believe he's referring to the 1900s, one case being Vermillon County, in which courts have found that if a plaintiff does not appear anywhere on the record, they cannot seek judicial review. So it's important to understand that under, when you seek a writ of certiorari, or under the vehicle of a statutory seeking of judicial review, only the record from the underlying administrative actions brought up. Courts don't hear additional evidence. So if a plaintiff or person attempting to bring a claim appears nowhere on that record, then the court can't make a determination on whether or not that plaintiff or that party was alleged. In Vermillon County and other cases where courts have found that you must appear somewhere on the record, in Vermillon County specifically, a township had annexed some property, and an individual attempted to then bring a claim on behalf of the township when he had never appeared on the underlying record. The court found since he wasn't on the record and could not show injury, he could not have standing to seek judicial review. Now, this level of participation is completely separate and does not rise nearly to the level that the appellees in the Holmes Court found that this, quote, party of record element requires. Finally, I'd like to discuss the Greer Court's determination as being quasi-legislative. It can be defined as quasi-judicial. And from a policy perspective of applying a quasi-judicial or quasi-legislative, it uses the gatekeeper or analysis in terms of working through standing. It's a much more difficult procedure for courts to do instead of just looking at the two separate vehicles of a common law writ, certiorari, and through a statutory vehicle like the administrative review law. For these reasons, this court should find that SOS members have standing and send this case back to the trial court for consideration of the merits. Thank you. All right. Thank you. Counsel, Mr. Moore, this case will be taken under advisement and a written decision shall issue. Mr. Moore, I'm assuming this is your first appellate argument? It is, Your Honor. All right. You did a fine job. Thank you. I'm sure you have a bright legal future. Thank you. Thank you again.